**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeannie Turner, | No. CV-18-00581-TUC-EJM |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Jeannie Turner brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Plaintiff raises two issues on appeal: 1) the Administrative Law Judge ("ALJ") failed to give clear and convincing reasons to discount Plaintiff's subjective symptom testimony and written statements; and 2) the ALJ improperly discounted Dr. Bitza's treating source opinion.

Before the Court are Plaintiff's Opening Brief, Defendant's Response, and Plaintiff's Reply. (Docs. 16, 17, & 18). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that the Commissioner's decision should be affirmed.

## I.  Procedural History

Plaintiff filed an application for social security disability benefits on July 31, 2014.

1    (Administrative Record ("AR") 156).[1] Plaintiff alleged disability beginning on June 25,

2    2014 based on right and left knee impairments, rheumatoid arthritis, and osteoarthritis. (AR

3    61). Plaintiff's application was denied upon initial review (AR 60) and on reconsideration

4    (AR 72). A hearing was held on May 24, 2017 (AR 44), after which ALJ Patricia A. Bucci

5    found, at Step Four, that Plaintiff was not disabled because she could perform her past

6    relevant work in customer service. (AR 36–37). On January 4, 2018 the Appeals Council

7    denied Plaintiff's request to review the ALJ's decision. (AR 1).

8        Plaintiff's date last insured ("DLI") for DIB purposes is June 30, 2017. (AR 87).

9    Thus, to be eligible for benefits, Plaintiff must prove that she was disabled during the time

10   period of her AOD of June 25, 2014 and her DLI of June 30, 2017.

11   **II.    Factual History**[2]

12       Plaintiff was born on April 21, 1962 making her 52 years old at the AOD of her

13   disability. (AR 61). She has a college education and past relevant work as a maintenance

14   person/greenskeeper, customer service, and a greyhound trainer. (AR 175, 189).

15       A.    Treating Physicians

16       Plaintiff has been seen by Dr. Campbell at the CORE Institute since 2013. On

17   November 19, 2013 she reported worsening right knee pain 7/10 with weakness, swelling,

18   and stiffness, worse with walking, standing, stairs, kneeling, squatting, twisting, and

19   bending. (AR 296). She had a knee replacement 12 years earlier and the doctor assessed

20   early asymmetric poly-wear and recommended a polyethylene exchange. (AR 298).

21       On March 11, 2014 Plaintiff was seen for right knee pain 7/10 and reported

22   difficulty going from sitting to standing. (AR 293).

23       On April 2, 2014 Plaintiff was 16 days post-surgery and had right knee pain 5/10,

24   getting better. (AR 290). She was doing very well with PT, her pain was controlled, and

25   she was using a walker and cane.

26       On May 13, 2014 Plaintiff was seen for a surgery follow-up and had right knee pain

27   ---
[1] Plaintiff filed a prior application in 2013 that was denied. (AR 62).

28   [2] While the undersigned has reviewed the entirety of the record in this matter, the following
summary includes only the information most pertinent to the Court's decision on Plaintiff's
claims on appeal.

6/10. (AR 286). The assessment stated she was doing very well and improving with PT and needed to continue. (AR 288).

On July 22, 2014 Plaintiff was seen for a surgery follow-up and had right knee pain 6/10. (AR 282). The doctor noted that instability had improved significantly and that most of Plaintiff's discomfort was stemming from the new tension on her soft tissues and would take time to settle down; she had no worrisome findings. (AR 284).

On September 16, 2014 Plaintiff was seen for severe left knee arthritis, pain 10/10, and was scheduled for total knee arthroplasty. (AR 279, 281). She was doing well with the polyethylene exchange on her right knee. (AR 281).

On October 21, 2014 Plaintiff was seen for left knee pain. (AR 276). She reported swelling and pain with walking, working, standing, sitting, getting in and out of cars, and going from sitting to standing, pain at night, and giving out. The PA noted that Plaintiff had significant degenerative joint disease resistant to conservative treatment and that she was scheduled for total knee arthroplasty. (AR 278). Plaintiff also had "end-stage arthritis which is unlikely to be relieved by physical therapy or injections" and "X-rays confirm bone-on-bone joint space narrowing with osteophytes and subchondral sclerosis."

On October 27, 2014 Plaintiff had left total knee arthroplasty. (AR 299). At a follow-up on November 12, 2014 her pain was 7/10 with limited range of motion. (AR 312).

On December 5, 2014 Plaintiff was seen for left knee surgery follow-up and reported pain 6/10, getting better, but difficulty with range of motion. (AR 309). The doctor assessed arthrofibrosis and recommended manipulation. (AR 311).

On December 11, 2014 Plaintiff had left knee manipulation; "range of motion, stability and tracking were excellent." (AR 325). At a follow-up on January 7, 2015 her pain was 3/10; she was doing very well and her range of motion was significantly improved. (AR 330, 332).

On February 11, 2015 Plaintiff reported right knee pain 1/10 and left knee pain 6/10. (AR 338). The assessment was doing well overall, range of motion much improved, and

still having warmth and swelling in the left knee (normal for this stage). (AR 340–41).

On April 1, 2015 Plaintiff reported throbbing and aching pain in the left knee, 6/10. (AR 335). The doctor noted she had unfortunately developed instability in the left knee and recommended a polyethylene exchange. (AR 337).

On May 11, 2015 Plaintiff had left knee poly exchange. (AR 357).

On May 15, 2015 Plaintiff had an initial evaluation at Spooner Physical Therapy. (AR 358). Her chief complaint was pain in the left knee 6/10, feeling sharpest when she attempted to pick up her leg. The assessment was that she was quite limited in her range of motion with prognosis for therapy moderately good overall. (AR 359). During PT Plaintiff had some improvement with walking (AR 363, 365, 367) and reported her knee was slowly improving (AR 369), but also reported increased pain when bending her knee (AR 371, 373) and increased pain after slipping and falling (AR 375).

On May 26, 2015 Plaintiff's left knee pain was 4/10, getting better, with joint swelling and stiffness. (AR 423). She denied instability and her pain was controlled with Percocet. The doctor noted she was progressing well with PT and had excellent range of motion. (AR 425).

On July 7, 2015 Plaintiff reported left knee pain 8/10, getting better, with joint swelling and stiffness. (AR 419). She was doing excellent after surgery on the left knee but had some anterior crepitus on the right knee. (AR 421).

On August 11, 2015 Plaintiff reported right knee pain and feeling crackling, popping, and grinding, and that she was unable to sit for long periods without pain. (AR 415). The doctor noted Plaintiff had fairly significant patellofemoral crepitus that had been slowly increasing to the point where she could not do any real activity that required quadriceps functioning or kneeling. (AR 417–18). He recommended a patellofemoral irrigation debridement and patellar component revision. (AR 418).

On October 6, 2015 Plaintiff reported both knees ached all day and she tried to swim but couldn't kick her legs. (AR 411). Findings on exam were largely normal, and the doctor noted Plaintiff was improving 5 months post-surgery and recommended she continue her

exercises. (AR 413).

On June 21, 2016 Plaintiff reported she fell on both knees while camping and wanted to make sure everything was ok and get more pain medication. (AR 407). X-rays showed stable components and good alignment with no fracture or dislocation, and findings on exam were good ROM bilaterally with some patellar crepitus on the right. (AR 410).

On July 14, 2016 Plaintiff was seen for lower back pain. (AR 402). She reported a 3-year history of pain, 7/10, made worse by leaning back, walking, physical activity, and rising out of a bed/chair. Plaintiff stated she could sit and stand for 60 minutes and walk for 1–3 blocks. Plaintiff's exam was largely normal, but the assessment noted she had a grade 1 spondylolisthesis at L4–L5, which was likely the cause of her back pain, and that her history of knee surgeries likely exacerbated the pain. (AR 404–05).

On July 27, 2016 Plaintiff had an evaluation at Spooner Physical Therapy for her back pain. (AR 382). Plaintiff rated her pain 7/10 currently and 10/10 at worst; it was aggravated by sitting for more than 1 hour, going from sitting to standing, walking for more than 20 minutes, standing, and driving. The "current level of activity" noted Plaintiff was taking care of a 4-year-old foster child and applying for disability. Objective findings included antalgic gait, unable to lunge or squat without exacerbation of symptoms, lumbar spine tender to palpation, very restricted on lumbar extension, and pain and slightly restricted with thoracic side bending and lumbar side bending. (AR 383). On August 10, 2016 Plaintiff reported her pain was decreased after every therapy session, but she still had the same pain between sessions. (AR 399).

On October 5, 2016 Plaintiff had no complaints with her left knee and some problems with her right knee. (AR 430). She had no pain or instability but reported losing her balance and falling often, and did not use a cane. Findings on exam were normal, and the recommendation was to continue strengthening both knees and use an assistive device to avoid falls. (AR 431–33).

On January 25, 2017 Plaintiff reported right knee pain 7/10, unchanged. (AR 529). Findings on exam were generally normal, and the plan was to address her patellofemoral

problems on the right knee because she had patellofemoral maltracking and scar tissue. (AR 531–32).

On April 17, 2017 Plaintiff had surgery for right knee revision of patellar component/debridement and quadricepsplasty. (AR 534). At a follow up on May 3, 2017 Plaintiff stated she was not getting good pain control, PT was going well, and she was going to be out of town the month of June. (AR 536). The doctor noted she was progressing very well with PT and had very good ROM for 2-weeks post-op. (AR 538). Plaintiff was prescribed oxycodone and discussed precautions for her travel.

B.    <u>Additional Medical Information</u>

Plaintiff's PCP, Dr. Ronald Bitza, completed a Disability Impairment Questionnaire on April 9, 2015. He stated that Plaintiff's diagnosis was arthritis in the bilateral knees and that her impairments were expected to last at least 12 months. (AR 342). For the clinical and laboratory findings supporting the diagnosis, he wrote "pain L knee." Plaintiff's primary symptoms were pain with walking or sitting; she had constant pain in the knees, left worse; pain aggravated by walking and sitting; and used Tylenol and Oxycodone as needed. (AR 343). Dr. Bitza opined that Plaintiff could sit for 4 hours, stand/walk for less than 1 hour, that it was medically necessary for her to avoid continuous sitting, and that she needed to get up and move around every 15 minutes. (AR 344). He further opined that she did not need to elevate her legs while sitting, that the most she could occasionally lift and carry was 0–5 pounds, and that she had no limitations in reaching, handling, or fingering. AR 344–45). Dr. Bitza opined that Plaintiff's symptoms would interfere with her attention and concentration frequently (from 1/3–2/3 of the workday), that she would need to take unscheduled breaks to rest every 15 minutes, and that she would be absent more than 3 times per month due to her impairments. (AR 345–46).

C.    <u>Plaintiff's Testimony</u>

On a Function Report dated November 11, 2014, Plaintiff reported that she could not sit, stand, or walk for more than an hour at a time, and then needed to lay down for her knees or legs to stop hurting. (AR 181). Her sleep is very miserable and she tosses and

turns unless she takes a pain pill. (AR 182). She sits down to get dressed, has a shower chair, and has difficulty getting off the toilet and tying her shoes. Plaintiff prepares simple meals and does very little cleaning—she can vacuum one room at a time, do the laundry, mow for 15 minutes, and clean the bathroom, but not the tub and shower. (AR 183). She tries to walk outside at least once a day, can drive and go out alone, and shops for groceries once a month for 30 minutes. (AR 184). Her hobbies are watching TV or movies; she can't play pool or ride a bike anymore. (AR 185). Plaintiff reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and concentrate. (AR 186). Lifting 45 pounds would be too much; she can walk for 30 minutes then needs to rest for 15 minutes, and can sit and stand for 1 hour.

On a Daily Activities Questionnaire dated November 13, 2014 Plaintiff reported that in a typical day she fixes her meals and lays in bed, and showers every other day. (AR 201). She can't sit, stand, walk, climb, or kneel. She can cook, clean, and grocery shop, but cleaning is difficult so she does one place each day. (AR 202). She takes two naps a day for 30 minutes or longer, uses Hydrocodone as needed for pain, and Oxycodone for pain and to sleep. Plaintiff reported that she uses a cane all the time to help her walk, and that she just had her third knee replacement and 14th knee surgery. (AR 203).

On a Function Report dated May 25, 2015 Plaintiff stated she could not work because she could not walk or sit for over 45 minutes and that she had to lay with her legs elevated to get relief. (AR 213). She tries to clean the house or her bedroom but it takes her all day because she has to rest, and she can't vacuum. (AR 216). Her hobbies are lying in bed watching TV and movies and sometimes she etches mirrors; she used to be able to sit in a chair or desk but can't now. (AR 217). Plaintiff reported she can only lift 5–10 pounds, cannot squat or kneel, can only walk for 50 feet and then needs to rest for 30 minutes, and she loses concentration to complete tasks because of pain. (AR 218).

On July 24, 2015 Plaintiff reported her medications were Oxycodone and Tylenol for pain, Lexapro for depression, and Flonase and Zyrtec for allergies. (AR 243).

At the hearing before the ALJ, Plaintiff testified that she stopped working because

of her knees; she was doing maintenance on a golf course and could not perform the tasks. (AR 48–49). She tried painting but could not stand up long enough, and tried laying pavers at her house by sitting because she can't kneel but it didn't work. (AR 49). She doesn't think she could do a less physical job because sitting is just as painful as standing. (AR 54). Plaintiff testified that she tried doing customer service work but it was too much to sit and they would not let her get up and down like she needed to. (AR 58).

Plaintiff has had two surgeries on each knee since 2014 and was using a cane at the hearing following a recent surgery. She can't swim anymore because she can't kick, and she was an artist but she can't do that anymore because of pain when sitting. (AR 50). In a typical day she lays in bed and watches TV; that's all she has done for the past 3 years. She can go to the grocery store for 15–20 minutes max.

Plaintiff said her doctors say her pain will go away but it hasn't. (AR 51). Ice and elevating help. The pain goes from her knee down into her foot and into her quad. (AR 52). Her pain is worse in the right knee, typically 8–9/10, maybe 7 on a good day. (AR 53). The pain in her left knee is about a 5 and surgery has helped. Plaintiff also has swelling in both legs from her knees to her ankles. (AR 53–54). She cannot walk a full block, can stand for 30 minutes, and can sit for 30 minutes. (AR 54). She has even talked to her doctor about amputating because the pain is so bad and she thought she would be able to do more with a prosthetic. (AR 58).

D.     Vocational Testimony

At the hearing before the ALJ, Mark Kelman testified as a vocational expert. (AR 55). He classified Plaintiff's past work as a greenskeeper II as medium and semi-skilled, and as a greenskeeper I and head greenskeeper as medium and skilled. (AR 55–56). Her past work as a customer service representative in a call center was sedentary and the low end of skilled. (AR 56).

The ALJ asked Kelman to assume an individual who could do a range of sedentary work with the following limitations: occasional bilateral operation of foot controls; never climb ladders, ropes, or scaffolds; never crawl; occasionally climb ramps or stairs;

frequently balance and stoop; occasionally kneel and crouch; and no exposure to dangerous machinery with moving mechanical parts or unprotected heights. (AR 56). Kelman testified such a person could not do any of the greenskeeper jobs but could do the call center job.

The ALJ then added an additional requirement that the hypothetical individual would need to use an assistive device for ambulation. (AR 57). Kelman testified such a person could not do the greenskeeper jobs but could still do the call center job. Finally, the ALJ asked whether a person could perform any work if they were off task for 15 percent of the 8-hour workday due to pain, and Kelman testified no.

On questioning by Plaintiff's attorney, Kelman testified that if standing and walking were reduced to less than 1 hour out of an 8-hour workday, Plaintiff could still do the customer service job. (AR 57). Kelman further testified that if Plaintiff were absent 3 days a month or more because of her conditions, she would not be able to sustain employment. (AR 57–58).

E.    ALJ's Findings

The ALJ found that Plaintiff had the severe impairments of status-post right knee replacement with polyethylene exchange, lumbar degenerative disc disease, status-post left knee replacement with revision surgery, and obesity. (AR 31).

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence of record. (AR 33). The ALJ specifically noted that although Plaintiff had undergone multiple knee surgeries, her symptoms had improved. The ALJ also noted that Plaintiff had gone camping and that she cared for a 4-year old foster child, indicating that her symptoms were not as severe as alleged and that she was more active than alleged, and that she went out of town for one month.  (AR 34–36). Finally, the ALJ noted that there was a continuing pattern of normal examinations, despite Plaintiff's complaints of pain. (AR 34).

The ALJ gave some weight to the DDS reviewing medical consultant's opinion at the initial level. (AR 35). That physician opined that Plaintiff was limited to light work,

but the ALJ found that Plaintiff was more limited due to her multiple knee surgeries and complaints of pain.

The ALJ gave substantial weight to the DDS reviewing medical consultant's opinion at the reconsideration level. (AR 35). That physician opined that Plaintiff was limited to sedentary work with additional limitations. The ALJ included those limitations in the RFC, but further limited Plaintiff to never crawling due to continued knee problems.

The ALJ gave little weight to Dr. Bitza's treating physician opinion because it was on a check-box form, because the limitations assessed were so extreme that it appeared to be a sympathetic opinion and there was no explanation for such extreme limitations, because the Plaintiff's ADL indicated she was less limited than opined, and because the opinion appeared to be based on Plaintiff's subjective complaints. (AR 35).

The ALJ found that Plaintiff had the RFC to perform sedentary work with the following restrictions: occasionally operate bilateral foot controls; never climb ladders, ropes, or scaffolds; never crawl; occasionally climb ramps and stairs; frequently balance and stoop; occasionally crouch and kneel; and never tolerate exposure to dangerous machinery with moving mechanical parts or unprotected heights. (AR 32). The ALJ found that Plaintiff could perform her PRW in customer service. (AR 36). The ALJ therefore concluded that Plaintiff was not disabled. (AR 37).

**III.    Standard of Review**

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes her from performing her past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the

claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (internal quotations and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011)

(citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (internal quotations and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV. Discussion

Plaintiff argues that the ALJ failed to give clear and convincing reasons to discount her subjective symptom testimony and that the ALJ failed to give specific and legitimate reasons to discount Dr. Bitza's treating source opinion. Plaintiff requests remand for an award of benefits, or for reconsideration of the evidence. The Commissioner argues that the ALJ properly evaluated Plaintiff's subjective symptom testimony and properly rejected Dr. Bitza's disability impairment questionnaire.

For the reasons explained below, the Court finds that the ALJ gave legally sufficient reasons to discount Plaintiff's subjective complaints and to discount Dr. Bitza's opinion. Accordingly, the Commissioner's decision will be affirmed.

### A. Subjective Symptom Testimony

Plaintiff first argues that the ALJ failed to provide clear and convincing reasons to discount her subjective symptom testimony.

"An ALJ's assessment of symptom severity and claimant credibility is entitled to great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015) (internal quotations and citations omitted).[3] This is because "an ALJ cannot be required to believe

---

[3] SSR 16-3p went into effect on March 16, 2016 and supersedes SSR 96-7p, the previous policy governing the evaluation of symptoms. SSR 16-3p, 2016 WL 1119029, *1. The

every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v. Comm'r. Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014). "If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal quotations and citation omitted).

While questions of credibility are functions solely for the ALJ, this Court "cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Comm'r Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Further, "[t]he ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*,

---

ruling indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." *Id*. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." *Id*. This ruling is consistent with the previous policy and clarifies rather than changes existing law. Under either ruling, the ALJ is required to consider the claimant's report of her symptoms against the record—in SSR 96-7p, this resulted in a "credibility" analysis; in SSR 16-3, this allows the adjudicator to evaluate "consistency." *Compare* SSR 16-3p *with* SSR 96-7p (both rely on two step process followed by an evaluation of claimant's testimony and contain the same factors for consideration). "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character," but "obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

169 F.3d 595, 599 (9th Cir. 1999).

While it is permissible for an ALJ to look to the objective medical evidence as one factor in determining credibility, the ALJ's adverse credibility finding must be supported by other permissible evidence in the record. *Bunnell*, 947 F.2d at 346–47 ("adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence"). However, "an ALJ may reject a claimant's statements about the severity of his symptoms and how they affect him if those statements are *inconsistent with or contradicted by* the objective medical evidence." *Robbins*, 466 F.3d at 887 (emphasis in original); *see also Rossiter v. Berryhill*, 2018 WL 1041172, *7 (D. Oregon Feb. 2, 2018) ("It is well settled that an ALJ may discount a claimant's testimony on the grounds that (1) it is inconsistent with objective medical evidence, (2) there is a lack of corroborating medical evidence, or (3) there is insufficient medical evidence to establish disability during the insured period.").

Here, the ALJ did not make a finding that Plaintiff was malingering; therefore, to support her discounting of Plaintiff's assertions regarding the severity of her symptoms, the ALJ had to provide clear and convincing, specific reasons.

The ALJ first found that the objective medical findings indicated that Plaintiff was likely to have some pain and limitations, but not to the extent that she alleged. (AR 33). The ALJ observed that although Plaintiff had undergone multiple knee surgeries, her symptoms had improved, and objective examination findings were generally normal. (AR 33–34). The ALJ found that the "continued pattern of normal examinations, despite complaints of pain, indicates that [Plaintiff's] symptoms were not as severe as alleged." (AR 34). The Court finds that this is a legally sufficient reason to discount Plaintiff's testimony. The ALJ did find that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements regarding the intensity and limiting effects of her symptoms were not entirely consistent with the medical evidence. The ALJ pointed to specific evidence in the record documenting normal findings on examination and improvements after surgery. (AR 33–35). The Court

also notes that the ALJ was sensitive to Plaintiff's subjective complaints as reflected in the RFC assessment limiting Plaintiff to a reduced range of sedentary work,[4] and the ALJ assessed more limitations than the state agency physicians.

As to Plaintiff's back pain, the ALJ noted that Plaintiff had received only conservative treatment and had not received any injections, nor had her providers recommended surgical intervention. (AR 34). Plaintiff does not challenge this finding.

The ALJ also found that activities Plaintiff participated in were inconsistent with her reports of disabling symptoms, including camping, going out of town for a month, and caring for a 4-year-old foster child. (AR 34–36). "There are two grounds for using daily activities to form the basis of an adverse credibility rating. The first is when the activities contradict prior testimony. The second is when the activities meet a threshold for transferable work skills." *Strutz v. Colvin*, 2015 WL 4727459, at *5 (D. Or. Aug. 10, 2015). Activities of daily living "may be grounds for discrediting the claimant's testimony to the extent that they contradict the claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1112–13. However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016. "Recognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' we have held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility.'" *Garrison*, 759 F.3d at 1016 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

Thus, to the extent that Plaintiff alleges a totally debilitating impairment—an inability to sit or stand for 30 minutes at a time, or walk a block—Plaintiff's ability to go

---

[4] The Court wholly rejects Plaintiff's argument that "where the medical evidence could support either the RFC the ALJ found or a more restrictive RFC testified to by the claimant, the tie would go to the claimant if the other evidence in the record supports the claimant's testimony." (Doc. 16 at 8). That is not the law, nor does Plaintiff specifically challenge the ALJ's RFC finding; thus, the Court will not address it further.

camping, care for a foster child, and travel belies that contention. On the other hand, Plaintiff's description of her daily activities including limited cleaning, watching television, and preparing simple meals is not inconsistent with her reported pain and limitations in sitting, standing, and walking. While Plaintiff's ability to perform some activities of daily living, go camping, and care for a child does not necessitate a finding that she has no difficulties in functioning, the record also does not compel the conclusion that Plaintiff urges that she is completely unable to function in a work setting. Given Plaintiff's allegation that she has spent the last 3 years lying in bed watching TV, the ALJ could properly consider that Plaintiff's activities of going camping, caring for a foster child, and traveling out of town for a month were inconsistent with her allegations of completely disabling pain. *See Garrison*, 759 F.3d at 1016; *Molina*, 674 F.3d at 1112–13.

In sum, the Court finds that the ALJ provided clear and convincing, specific reasons to find that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the objective medical evidence or other evidence in the record. Plaintiff essentially asks the Court to reweigh the evidence more favorably to her, but Plaintiff's alternate interpretation is not enough to assign error to the ALJ's findings. "While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the [ALJ]." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). "[T]he ALJ's interpretation of [the claimant's] testimony might not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it." (*Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). "When the evidence is susceptible to more than one rational interpretation, and the [ALJ's] conclusion is one such rational interpretation, that interpretation must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (where "the evidence

can support either outcome, the court may not substitute its judgment for that of the ALJ"). Accordingly, the Court finds no error.

B.    Dr. Bitza's Opinion

Plaintiff's second argument is that the ALJ erred by improperly discounting Dr. Bitza's treating source opinion.

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADL. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions.

He must set forth his own interpretations and explain why they, rather than the doctors',
are correct." *Id*. However, "when evaluating conflicting medical opinions, an ALJ need not
accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately
supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Finally, the ALJ must evaluate medical opinions according to the requirements set
out in 20 C.F.R. § 404.1527(c): (1) the frequency of examination and the length, nature,
and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the
consistency of the opinion and the record as a whole; (4) whether the physician is a
specialist; and (5) other factors that would support or contradict the opinion.

Here, Dr. Bitza opined that Plaintiff could never lift anything over 5 pounds, could
sit for 4 hours, stand/walk for less than 1 hour, must get up every 15 minutes and move
around for 15 minutes before resuming sitting, would need to take unscheduled breaks
every 15 minutes, would frequently have symptoms interfering with attention and
concentration, and would be absent more than 3 times per month. (AR 342–46).

The ALJ first noted that Dr. Bitza "simply checked the boxes on a form and the
limits are so extreme that it appears to be a sympathetic opinion." (AR 35). The ALJ further
stated that there was no explanation for such extreme limits, as Plaintiff's treating
orthopedic surgeons "frequently noted essentially normal objective examinations with only
some limitations." "The more a medical source presents relevant evidence to support a
medical opinion, particularly medical signs and laboratory findings, the more weight [the
Commissioner] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). In addition,
"[t]he better an explanation a source provides for a medical opinion, the more weight [the
Commissioner] will give that medical opinion." *Id.* Here, Dr. Bitza's opinion consists of
brief comments on a check-box form, and he provided no clinical or laboratory findings to
support his opinion other than to write "pain L knee." (AR 342). While the record includes
several pages of notes from Plaintiff's appointments with Dr. Bitza, they are extremely
brief and largely illegible, and thus do not help provide support for his opinion. "An ALJ
need not accept a treating physician's opinion that is conclusory and brief and unsupported

by clinical findings." *Tonapetyan*, 242 F.3d at 1149 (opinion properly rejected where "it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [the claimant's] alleged conditions"); *Tommasetti*, 533 F.3d at 1041 (doctor's records did not provide support for limitations assessed on sitting and standing and need for breaks; incongruity was specific and legitimate reason to reject opinion); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider."). Thus, this is not a case like *Garrison*, where the court found that the ALJ erred in rejecting a check-box form where the doctor's opinion was "based on significant experience with Garrison and supported by numerous records, and [was] therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." 759 F.3d at 1013, n.17 (check-box forms "were entirely consistent with the hundreds of pages of treatment notes").

Further, as the ALJ noted and this Court's review of the record indicates, many of Plaintiff's exams showed essentially normal findings. While the medical evidence may be interpreted in different ways, that does not make the ALJ's conclusion incorrect. *See Burch*, 400 F.3d at 680–81 ("[W]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.").

The ALJ also noted that Plaintiff's ADL, including caring for a 4-year-old foster child and going camping, indicated that she was less limited than Dr. Bitza opined. (AR 35). As the Court explained above, the ALJ could properly consider that Plaintiff's daily activities were inconsistent with her allegations of spending her days lying in bed and completely disabling pain. Thus, the ALJ could properly discount Dr. Bitza's opinion where the opinion was inconsistent with Plaintiff's ADL.

Finally, the ALJ found that Dr. Bitza was Plaintiff's "primary care provider and appear[ed] to be forming his opinion based on [Plaintiff's] subjective complaints; as objective examinations by her treating surgeon and physical therapist [did] not report such

extreme limitations." (AR 35–36). An ALJ may properly reject a physician's opinion that is based on a claimant's subjective complaints when those subjective complaints have been discredited. *See Tommasetti*, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible."); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ was free to reject examining physician's opinion where it was based on claimant's subjective complaints and ALJ had properly discounted claimant's credibility); *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Here, the ALJ found that Plaintiff's subjective symptom testimony was not entirely consistent with the medical and other evidence of record, and that Plaintiff's allegations exceeded the limitations reasonably expected from the medical findings. Thus, the ALJ could properly discount Dr. Bitza's opinion where the opinion appears to be largely based on Plaintiff's subjective complaints.

In sum, the Court finds that the ALJ provided specific and legitimate reasons to discount Dr. Bitza's opinion. While the evidence before the ALJ may be subject to more than one rational interpretation, the Court may not substitute its judgment for that of the ALJ. "The medical evidence presented perhaps would permit a reasonable mind to make a finding of disability. It also would permit a finding of no disability. When there is evidence sufficient to support either outcome, we must affirm the decision actually made." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). Accordingly, the Court finds no error on this point.

**V.    Remedy**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

Here, the undersigned finds that the ALJ's decision is supported by substantial evidence and is free from legal error. Accordingly, in light of the foregoing,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and close its file on this matter.

Dated this 3rd day of March, 2020.

Eric J. Markovich
United States Magistrate Judge